**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 |
| GREEN ROADS, INC.,[1] | Case No. 23-11738 |
| Debtor. | |
| _____/ | |

**DECLARATION OF JULIE PILCH IN SUPPORT OF CHAPTER 11 PETITION AND
CERTAIN FIRST DAY MOTIONS**

I, Julie Pilch, declare, pursuant to section 1746 of title 28 of the United States Code, that:

1.      I am serving as the interim the chief executive officer of Green Roads, Inc. (the "Debtor").

2.      All facts set forth in this declaration are based on my personal knowledge or, where specified, based on my knowledge, information, or belief.  If I were called to testify, then I would testify competently as to the facts set forth in this Declaration.

3.      In my capacity as interim chief executive officer of the Debtor, I am familiar with the Debtor's day-to-day business operations, business, and financial affairs.  In addition, for the previous two (2) years immediately preceding the date on which the Debtor commenced this case (the "Petition Date"), I served as the Debtor's controller.  I currently fulfill controller duties as well.  There is no separate chief financial officer.  I am also familiar with the Debtor's day-to-day business operations, business, and financial affairs from my work in this role.

4.      I am authorized by the Debtor to submit this declaration in support of its chapter 11 petition and certain motions requesting relief to assist with the Debtor's transition into chapter 11

---

[1]      The last four digits of the Debtor's federal tax identification number is 0208.  The Debtor's principal address is 601 Fairway Dr, Deerfield Beach, FL 33441.

1

22729161.v3

(the "First Day Motions").

5. The Debtor adopted a resolution (the "Resolution") authorizing the filing of its bankruptcy petition. A true and exact copy of the Resolution is attached as **Exhibit A**.

## I. Description of the Debtor's Business Operations

6. Green Roads is an award-winning company that produces high-quality wellness products using hemp-derived cannabidiol ("CBD") and other beneficial cannabinoids. Through premium CBD oils, edibles, softgels, capsules, topicals, coffee, and more, the Debtor seeks to help every person find the healthiest version of themselves through the power of plants. The Debtor is unique in that it is one of a very small number of CBD brands that produce its own product in its own cGMP and FDA-certified facilities.

7. The Debtor's headquarters are located at 601 Fairway Drive, Deerfield Beach, Florida 33441. It leases this facility. The Debtor manufactures its products in leased facilities located at 3345 NW 74th Avenue, Miami, Florida 33122.

8. As of this filing, the Debtor's products are sold in thousands of retail locations and online at greenroads.com, with more than 30,000 five-star product reviews. The Debtor engages in extensive lab testing for safety and quality. As a result, in addition to its e-commerce platform, the Debtor's web site maintains information for the general public about the importance of lab testing for safety and quality of CBD and how to select the right product.

9. For the Debtor's most recent fiscal year, which ended on November 30, 2022, the Debtor's annual revenue on a cash basis was $15,814,263.00. Approximately 55.6% of the Debtor's revenue was derived from e-commerce sales, and approximately 44.4% was derived from wholesale transactions on a business-to-business basis. Notwithstanding such sales, the Debtor experienced net losses totaling about $57.2 million, comprised of approximately $45 million in a

2

22729161.v3

write-off of intangible assets and approximately $12.2 million of operating losses.

10.     The Debtor has conducted a search of its books and obtained a report regarding active financing statements from the Florida Secretary of State's Office and Delaware Secretary of State's Office shortly before filing its chapter 11 petition.  Based on these searches, the Debtor is not aware any party who may claim a security interest in some or all of the Debtor's "cash collateral" (the "Cash Collateral"), as that term is used in section 363(a) of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor is aware of a financing statement in favor of one party claiming a security interest in all assets of the Debtor but understands that one of the Debtor's parent entities purchased the underlying debt obligation, that the debt obligation is satisfied, and that one of the Debtor's parent entities has or will record a termination statement imminently.

11.     Based on the Debtor's books and records, the Debtor estimates that its total liabilities to unsecured creditors is about $5.3 million, except for and not including disputed litigation claims.

12.     The book value of the Debtor's current and fixed assets totals about $6.055 million. This does not include intangible assets.

## II.     The Debtor's Corporate Structure

13.     The Debtor or predecessor entities was formed in 2013 by Laura Fuentes and Arby Barroso.  I understand that Ms. Fuentes was or is a licensed compounding pharmacist who was friends with Mr. Barroso.  I understand that Mr. Barroso struggled with health issues and believed that CBD could help him.  I further understand that Ms. Fuentes evaluated CBD products for a period of time before launching the Debtor to manufacture and sell CBD products.

14.     I understand that by 2021 the Debtor was, to the best of my knowledge, the largest

3

22729161.v3

privately-owned CBD company in the United States.

15.     On or about June 17, 2021, The Valens Co. ("Valens"), a Canadian company, acquired the Debtor in a transaction with an up-front value of $40 million, including $25.4 million in common shares of Valens and up to $14.6 million in cash, plus up to an additional $20 million in earnout payments if certain goals were met following the closing of the transaction. Cash payments did not meet the maximum amounts provided for due to the Debtor's financial performance. There is pending litigation over whether Ms. Fuentes and other founders of the Debtor or its predecessors are entitled to the additional earnout payments described in this paragraph.

16.     Valens, in turn, is a subsidiary of SNDL, Inc. ("SNDL" and together with Valens, the "Parent Entities"), a Canadian company and the ultimate, indirect parent of the Debtor.

17.     The Debtor's officers and directors, with respective compensation, are: Tyler Robson is the company's sole director. The Debtor does not provide compensation for this position. I serve as interim chief executive officer. My annual base compensation is $200,000.00, in addition to bonuses that may be earned. My compensation last year was $150,000.00 plus bonuses, when I served as controller and not as interim chief executive officer.

18.     There are no individuals who are insiders of the Debtor's officers who are employed by the Debtor. However, Mr. Robson is employed by SNDL in the division overseeing the Debtor.

**III.     Events Leading to the Debtor's Chapter 11 Filing and Chapter 11 Exit Strategy**

19.     The Debtor's financial performance has not lived up to what was expected at the time of the transaction with Valens. As noted, the Debtor experiences operating losses on an annual basis, and Valens or SNDL have had to fund some obligations of the Debtor to maintain business operations. This includes, most recently, funding payroll shortly before the Petition Date.

22729161.v3

20.     The Debtor's losses are driven by two factors.  The first is increasing competition in the CBD industry.  The second is supply chain and other stressors due to Covid-19, including that many small retailers closed down, thereby limiting the Debtor's distribution network.

21.     Some of this can be rectified through operational changes, including reductions in force.  I anticipate that the Debtor will, at or near the Petition Date, implement operational changes, including reductions in force, with annualized financial benefit totaling approximately $2.3 million.

22.     However, even with these near-term changes, the Debtor's income statement does not support its balance sheet, and the Debtor's Parent Entities, are unwilling to continue to fund the Debtor's operations without a structured exit from the transaction.

23.     Consequently, the Debtor has developed a chapter 11 exit strategy premised on the following:

24.     **DIP Financing:**  An affiliate of the Parent Entities (the "Lender") will provide the Debtor with post-petition financing as described more fully below (the "DIP Facility").  The DIP Facility will be used to finance operations and a sale process (the "Sale Process") subject to requirements and case milestones required by the Lender. These requirements mandate a Sale Process.

25.     **Sale Process:** Pre-petition, the Debtor engaged in marketing and identified five (5) parties who may be potential purchasers of assets but does not have an offer in hand at this point in time.  Post-petition, the Debtor intends to run a sale process (the "Sale Process") that is designed to maximize value to creditors.  Based on DIP Financing requirements, the Debtor anticipates the following timeline with respect to the Sale Process:

22729161.v3

| Event | Deadline |
|---|---|
| File Bid Procedures Motion | Within seven (7) of the Petition Date |
| Date of Entry of Bid Procedures Order | Within thirty-five (35) calendar days of the Petition Date |
| Marketing Period Commences | Upon entry of the Bid Procedures Order |
| Marketing Period Ends | On the ninetieth (90th) calendar day after entry of the Bid Procedures Order |
| Auction Held | Within seven (7) calendar days after the conclusion of the marketing period |
| Sale Hearing | Within seven (7) calendar days of the auction |

26.     **Liquidating Plan:**  Consequently, the Debtor presently expects to file a liquidating plan to distribute proceeds of the Debtor's assets in accordance with the requirements of the Bankruptcy Code.  While the Debtor may file a liquidating plan prior to conclusion of the Sale Process, confirmation likely cannot occur until conclusion of a sale.

**IV.     Allegations in Support of the First Day Motions**

**A.     The DIP Financing Motion**

27.     As noted, the Debtor has or will file a motion requesting approval of the DIP Facility (the "DIP Motion").  I have reviewed the DIP Motion and documents that would, if approved, memorialize the DIP Facility.  To the best of my knowledge, information, and belief, the factual allegations in the DIP Motion are true and accurate.

28.     The relief requested in the DIP Motion is necessary for the Debtor to be able to

22729161.v3

operate while in chapter 11.  Simply put, without the DIP Facility and approval of the DIP Motion, the Debtor lacks sufficient liquidity to maintain business operations.  Ceasing business operations will destroy value for creditors and harm the Debtor.

29.     It is my belief that the DIP Facility represents the best available financing option for the Debtor given the Debtor's liquidity challenges.  The Debtor negotiated a term sheet with the Lender, with independent legal counsel representing the Debtor and the Parent Entities.  As noted in the DIP Motion, the terms of the DIP Facility are generally favorable to the Debtor and provide necessary liquidity.  I understand that counsel for the Debtor has, shortly before the Petition Date, communicated with other petition lenders and that as of the Petition Date there are no other options for financing that are equal to or better than the DIP Facility.  If a better option emerges postpetition, then the Debtor will exercise its business judgment.

30.     The Debtor requests that the DIP Motion be granted on an interim and final basis, with interim relief limited only to financing needs of the Debtor that are necessary to avoid immediate and irreparable harm.  It is my belief that such interim relief, as set forth in the DIP Motion, is necessary to avoid immediate and irreparable harm to the Debtor in that, without such relief, the Debtor would be unable to continue to pay for goods, supplies, and payroll, among other things, and would likely need to cease business operations in short order.  No portion of the DIP Financing provided on an interim basis will be used to pay for professional fees for the Debtor's general bankruptcy professionals.

B.     **The Payroll Motion**

31.     The Debtor has or will file a motion seeking permission, but not requiring, the Debtor to pay pre-petition payroll and to maintain employee benefit programs (the "Payroll Motion")  I have reviewed the Payroll Motion and the allegations contained therein.  To the best

22729161.v3

of my knowledge, information, and belief, the allegations in the Payroll Motion are true and accurate.

32.     I understand that by the Payroll Motion the Debtor seeks authorization to pay certain accrued wages, salaries, and payroll-related expenses; to make payments to certain insurance companies in order to pay for employer-paid contributions to employee benefit programs; and to authorize all applicable banks or financial institutions to receive, process, honor, and pay any and all checks drawn on the Debtor's accounts in relation to amounts to be paid under the Payroll Motion.

33.     I believe that any delay in paying compensation and contributions to employee benefit programs will damage the Debtor's relations with its employees; cause irreparable harm to morale; and harm the value of the Debtor's business, property, and assets.  Given the unique nature of the Debtor's business as a produce of CBD products, the Debtor's workforce constitutes one of its most valuable assets, and material workforce attrition at this delicate time in the Debtor's life would be detrimental to preservation of value for distribution to creditors, in addition to being harmful to remaining employees.

34.     Thus, to maintain and preserve morale of the Debtor's continuing labor force during this chapter 11 case, I believe that it is essential that the Payroll Motion be granted.

35.     Absent the relief requested in the Payroll Motion, I believe that the Debtor's workforce will suffer undue hardship and, in many instances, suffer financial difficulties because their wages are needed to enable payment of personal obligations.  Further, I believe that members of the Debtor's workforce would seek other employment if not paid and that the Debtor could lose critical team members who would be difficult to replace.  The loss of these employees would jeopardize the Debtor's continuing business operations and the ability to consummate a going

22729161.v3

concern sale as a way to de-lever the balance sheet associated with the Debtor's assets.

**C.    The Cash Management Motion**

36.    The Debtor has or will file a motion requesting permission to maintain its pre-petition cash management system and bank accounts in addition to requesting certain other related forms of relief, including authorizing payment through credit or debit cards and wire transfer as well as a waiver of the requirements of section 345(b) of the Bankruptcy Code (the "Cash Management Motion").  To the best of my knowledge, information, and belief, the allegations in the Cash Management Motion are true and accurate.

37.    I believe the relief requested in the Cash Management Motion is critical to avoid disruption to the Debtor's operations and irreparable harm to the Debtor.  The Debtor's cash flow is dependent upon payments and transfers of fund to the Debtor from different sources, many of which are automated.  It is my understanding that opening new bank accounts could cause significant delays in the Debtor's receipt of electronic payments, which is the predominate form of payment to the Debtor.  This would cause irreparable harm to the Debtor due to the fact that, absent continued payments on the current schedule, the Debtor would lack sufficient funds to maintain operations.

38.    I also believe that the other forms of relief requested in the Cash Management Motion are critical to the Debtor's business.

**D.    The Critical Vendor Motion**

39.    The Debtor has or will file a motion requesting permission to pay certain vendors that it deems to be critical (the "Critical Vendor Motion") as well as a related motion to seal the list of such vendors to protect confidential business information (the "Motion to Seal").  I have reviewed the Critical Vendor Motion and the Motion to Seal.  To the best of my knowledge,

9

information, and belief, the allegations in the Critical Vendor Motion and the Motion to Seal are true and accurate.

40.     I believe the relief requested in the Critical Vendor Motion is critical to avoid disruption to the Debtor's operations and irreparable harm to the Debtor.  It is my belief that, in the  Debtor will face irreparable harm if a Critical Vendor (as defined in the Critical Vendor Motion) refuses to perform services or provide goods to the Debtor during the pendency of this bankruptcy case.  Avoiding disruption to the Debtor's business operations will ultimately assist in facilitating a successful transition into chapter 11 and support the Debtor's efforts to engage in maximizing value.

41.     I believe the relief requested in the Motion to Seal is also necessary and important to protect the Debtor's business.  It is my belief that making the list of Critical Vendors public will harm the Debtor by causing other vendors to demand payment on terms that could be less favorable than the Debtor ordinarily provides or has.  This could deplete necessary cash from the Debtor at a delicate time in the Debtor's life-cycle.

E.      **The Utilities Motion**

42.     The Debtor has or will file a motion requesting permission to provide adequate assurance to the Debtor's utilities (the "Utilities Motion").  I have reviewed the Utilities Motion. To the best of my knowledge, information, and belief, the allegations in the Utilities Motion are true and accurate.

43.     I believe the relief requested in the Utilities Motion is critical to avoid disruption to the Debtor's operations and irreparable harm to the Debtor.  Interruption or termination of Utility Services (as defined in the Utilities Motion) would hinder the Debtor's business production, business operations, and its ability to successfully reorganize.  I believe that such an interruption

22729161.v3

could lead to an immediate liquidation to the detriment of the Debtor's going-concern value and the value of its estate for creditors.  s

### F.    The Need for Emergency or Expedited Hearings

44.    Due to the nature of the relief sought by the First Day Motions (which does not include the Bid Procedures Motion), the Debtor seeks expedited or emergency hearings on them in light of the relief requested and the Court's availability, as soon as is reasonably possible after the Petition Date.

45.    The Debtor seeks immediate relief with respect to the DIP Motion.  Without immediate authority to obtain the DIP Facility on an interim basis, the Debtor will be unable to operate its business going forward, and this would cause immediate and irreparable harm to the Debtor.  It would also harm creditors by destroying value that would otherwise be available for debt repaying following the Sale Process.

46.    The Debtor seeks immediate relief with respect to the Payroll Motion.  Without immediate authority to pay outstanding pre-petition payroll (subject to the limitations of the Bankruptcy Code) and to maintain employee benefit programs, the Debtor will not be able to pay its employees in an ordinary and timely manner.  This would almost certainly lead to a loss of employees at a time when the Debtor needs them most.

47.    The Debtor also seeks immediate relief with respect to the Cash Management Motion, primarily to maintain existing bank accounts.  The Debtor must transition into chapter 11 with as little disruption as possible.  Requiring the Debtor to open new bank accounts will likely lead to delays or losses of payments, which would harm the Debtor's business and its ability to pay expenses, such as payroll, in an ordinary and timely manner.  Moreover, the Debtor relies on its existing bank accounts and other aspects of its cash management system for important business

22729161.v3

functions, such as payment of required taxes, and lacks meaningful cash reserves to withstand a protracted lapse in payment should that arise.

48.     The Debtor seeks immediate relief with respect to the Critical Vendor Motion and the Motion to Seal.  I believe this relief is necessary to avoid immediate and irreparable harm that would befall the Debtor if Critical Vendors (as defined in the Critical Vendor Motion) refuse to provide necessary goods and services and that accommodations for such Critical Vendors is, in my belief, necessary to ensure that this does not occur.  Similarly, I believe that the Motion to Seal requires relief in the first days of this case to ensure that the Debtor can implement the relief requested in the Critical Vendor Motion without the risk that other vendors may suddenly demand new or different payment and credit terms from what the Debtor currently provides.  This would likely deplete necessary funding liquidity at a time when the Debtor cannot afford to do so.

49.     Lastly, the Debtor seeks immediate relief with respect to the Utilities Motion to avoid immediate and irreparable harm that would befall the Debtor if Utility Services (as defined in the Utilities Motion) is terminated unexpectedly.  Simply put, without access to reliable Utility Services, the Debtor will be unable to continue business operations, to the detriment of its going-concern value and the value of its estate.


*[Remainder of Page Intentionally Left Blank]*

22729161.v3

I certify under penalty of perjury that the foregoing is true and correct.

Date: March 6, 2023

_____
Julie Pilch

13

# EXHIBIT A

**(Resolutions)**

**UNANIMOUS WRITTEN CONSENT OF
DIRECTORS OF GREEN ROAD, INC.**

The undersigned, constituting all directors (the "Directors") of Green Road, Inc., a Delaware business corporation (the "Company"), and in accordance with those certain Amended and Restated Bylaws of Green Roads, Inc., adopted on September 1, 2021 (as the same may have been or may be amended from time to time (the "Bylaws"), and pursuant to Delaware law, and the Directors consenting to the actions being taken herein without a meeting, hereby consent to, approve, and adopt the following resolutions by unanimous written consent:

| | |
|---|---|
| **WHEREAS:** | The Directors have reviewed the financial and operating condition of the Company, its assets, and its current and long-term liabilities, including the historical performance of the Company, its current and long-term liabilities, the market for its assets, credit market conditions, and macroeconomic conditions impacting the Company, and the Directors being apprised of the efforts to reorganize the Company; and further |
| **WHEREAS:** | The Directors have determined it desirable and in the best interests of the Company, its creditors, and other interested parties, that a voluntary petition be filed by the Company seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and to pursue debtor-in-possession financing, potential sales of its assets, or a potential reorganization; and further |
| **RESOLVED:** | That in the judgment of the Directors, it is desirable and in the best interests of the Company and its creditors and other interested parties that the Company file a voluntary petition seeking relief under the provisions of chapter 11 of the Bankruptcy Code; and further |
| **RESOLVED:** | That the Company be and hereby is authorized and empowered to execute and verify or certify a petition under chapter 11 of the Bankruptcy Code, and to cause the same to be filed in the United States Bankruptcy Court for the Southern District of Florida or any other appropriate bankruptcy court (the "Bankruptcy Court") at such time as the Company shall determine; and further, |
| **RESOLVED:** | That the Company appoints Julie Pilch as interim chief executive officer (the "Authorized Person") and, as such, that she be and hereby is authorized on behalf of, and in the name of, the Company, to execute and file any and all petitions, schedules, motions, lists, applications, pleadings, debtor-in-possession loan documents, sale transaction documents, and other similar papers, and to take any and all such other and further actions which the Company or its legal counsel may deem necessary or appropriate to file the voluntary petition for relief under chapter 11, and to take and perform any and all further acts and deeds that the Authorized Person deems necessary, proper, and desirable in connection with a chapter 11 case of the Company, |

1

with a view to the successful prosecution of such case, including, without limitation, seeking authority to borrow under a pre- or post-petition credit facility, to grant liens and other security therefor, seeking authority to sell all or substantially all of the Company's assets, retaining professionals in the chapter 11 case, preparing and executing necessary documentation and reporting, and filing and prosecuting a plan as provided for under chapter 11 of the Bankruptcy Code; and further,

**RESOLVED:**  That the Authorized Person be and hereby is authorized and directed to take such actions and to make, sign, execute, acknowledge, and deliver (and record in a relevant office, if necessary) any and all such documents listed above (including exhibits thereto), including any and all affidavits, orders, directions, certificates, request, receipts, financing statements, or other instruments as may reasonably be required to give effect to these resolutions, and to execute and deliver such agreements (including exhibits thereto) and related documents, and to fully perform the terms and provisions thereof; and further,

**RESOLVED:**  That the Company be and hereby is authorized to retain the law firm of Dentons, including Dentons Bingham Greenebaum LLP and Dentons US LLP, as general bankruptcy counsel to the Company in connection with the chapter 11 case, if the Company determines that filing of a voluntary petition for relief is proper, to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to pay Dentons at its standard hourly rates in connection with its representation of the Company, and to reimburse Dentons for any actual expenses incurred in connection with its employment by the Company; and further,

**RESOLVED:**  That the Company be and hereby is authorized to retain and engage all assistance by legal counsel, accountants, investment banking advisors, financial advisors, and other professionals, subject to approval of the Bankruptcy Court, to perform any and all further acts and deeds that the Authorized Person deems necessary, proper, advisable, or desirable in furtherance thereof with a view to the successful prosecution of the Company's chapter 11 case; and further,

**RESOLVED:**  That all of the acts and transactions relating to matters contemplated by the foregoing resolutions of the Company's Directors, in the name and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved, and ratified.

[Remainder of page intentionally left blank]

2

**DIRECTOR OF GREEN ROAD, INC.:**

Date: March 5, 2023

By: Tyler Robson
Its: Director

3

#22718497v1