**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:

GREEN ROADS, INC.,[1]

      Debtor.

_____/

Chapter 11

Case No. 23-11738-SMG

**THE DEBTOR'S COMBINED (I) RESPONSE  TO THE ORDER**
**TO SHOW CAUSE WHY CHAPTER 11 CASE SHOULD NOT BE**
**DISMISSED OR CONVERTED TO CHAPTER 7, AND (II) OBJECTION**
**TO THE MOTION OF THE UNITED STATES TRUSTEE TO DISMISS**
**THIS CASE OR CONVERT THIS CHAPTER 11 CASE TO CHAPTER 7**

Green Roads, Inc., as debtor and debtor in possession (the "Debtor"), by and through

counsel, hereby submits this combined response and objection (this "Combined Response") to (i)

the Court's *Order to Show Cause Why Chapter 11 Case Should Not Be Dismissed or Converted*

*to Chapter 7* [Docket No. 173] (the "Show Cause Order"); and (ii) the *Motion of the United States*

*Trustee to Dismiss this Case or Convert This Chapter 11 Case to Chapter 7* (the "UST Motion")

filed by the United States Trustee ("U.S. Trustee").  In support of this Combined Response, the

Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      Conversion or dismissal of this case for cause is not warranted.  First, as further

described herein, the Debtor has engaged in significant efforts following the sale of its assets to

resolve issues, negotiate and reduce claims against it, and develop a plan.  Second, to that end, the

Debtor has now filed a plan that proposes to make meaningful distributions to creditors.  Creditors

should have the opportunity to vote on this plan and determine for themselves if it is preferable to

---

[1]      The last four digits of the Debtor's federal tax identification number is 0208.

1

conversion or dismissal.  Finally, the Debtor has caught up on its operating reports, including timely filing its March 2024 report.  Review of these reports, in concert with the other post-sale efforts of the Debtor, clarifies that the Debtor's estate is not in poor financial condition or suffering inordinate losses.  In fact, the Debtor is poised to confirm a plan that will satisfy all administrative and priority claims and make a meaningful distribution on unsecured claims.

#### BACKGROUND

2.      On March 6, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida (the "Court"), commencing the instant chapter 11 case (the "Case").

3.      The Debtor is operating its business and managing its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      As of this date, the Office of the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in this Case.

### I.      The Debtor Sold Substantially All of Its Assets.

5.      On March 13, 2023, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Approving Bidding Procedures in Connection With the Debtor's Bidding Process; (II) Approving the Transaction Ultimately Selected as the Highest and Best Alternative Through the Bidding Process, Including a Possible Sale of Assets Free and Clear of Liens, Claims and Encumbrances; and (III) Granting Related Relief* [Docket No. 35] (the "Sale Motion").

6.      On April 3, 2023, the Court entered the *Order Approving Bidding Procedures in Connection With the Debtor's Bidding Process and Granting Related Relief* [Docket No. 62] (the "Bid Procedures Order") approving the Debtor's proposed bidding terms for the sale of substantially all of the Debtor's assets (the "Sale").

23761915.v3

7.      On May 18, 2023, the Court entered the *Order (I) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (II) Granting Related Relief* [Docket No. 93] (the "Sale Order") approving of Global Widget, LLC (the "Purchaser") as the purchaser of substantially all of the Debtor's assets.

8.      On May 31, 2023, the Debtor closed on the Sale to the Purchaser under the terms set forth in the Sale Order and the *Asset Purchase Agreement by and Among Green Roads, Inc. and Global Widget, LLC* [Docket No. 90-1] (the "Asset Purchase Agreement").

9.      Pursuant to the Asset Purchase Agreement, the Purchaser paid the Debtor $3,100,000.00 (the "Sale Proceeds") for substantially all of the Debtor's assets.  Asset Purchase Agreement, Section 2.1(a).

## II.      Post-Sale Activities of the Debtor

10.      Since the close of the Sale, the Debtor has engaged in several activities necessary to wind-down its business, confirm a plan, and close its estate.  These include, without limitation: (i) repaying the Debtors' senior secured debtor-in-possession financing facility (the "DIP Financing Agreement") [Docket Nos. 114 and 127] with Court approval; (ii) transferring funds held by Subsidiaries (as defined herein) to the Debtor [Docket Nos. 106 and 118] with Court approval; (iii) addressing various tax issues, including negotiating with taxing authorities in various states where the Debtor previously conducted business in order to reduce the amount of sales tax liability potentially owed by the estate; and (iv) developing a chapter 11 plan, including discussing with various parties in interest – including the Debtor's parent entities, The Valens Co. ("Valens") and SNDL, Inc. ("SNDL"), as well as the  U.S. Trustee – regarding the terms of a plan of liquidation.

3

23761915.v3

A.       Repayment of the Debtor's Obligations under the DIP Financing Agreement

11.     At the outset of this Case, the Debtor obtained the Court's approval to enter into the DIP Financing Agreement with Liquor Stores Limited Partnership, by its general partner, Liquor Stores GP, Inc., a Canadian limited partnership ("LSLP") or an existing or newly formed entity under the control of LSLP ("Affiliate" and, for purposes of this Motion, collectively referred to with LSLP as the "Lender").  Pursuant to the DIP Financing Agreement, the Debtor was permitted to borrow up to $1.75 million from the Lender, which obligation was secured by a first lien on all of the Debtor's assets and carried a 15% interest rate.  The DIP Financing Agreement permitted the Debtor to make prepayments without premium or penalty.  Prior repaying the DIP Financing Agreement, the Debtor was providing weekly cash reporting to the Lender.

12.     Following the close of the Sale and the infusion of cash proceeds into the Debtor's estate, the Debtor sought in August 2023 to repay its obligations to the Lender.  Principally, the Debtor's motivation for repaying its obligations under the DIP Financing Agreement was to reduce the incurrence of unnecessary interest expense while the Debtor sought to address and resolve other issues in the Case prior to the proposal of a plan.  On September 8, 2023, the Court entered an order authorizing the Debtor to pay approximately $1.3 million to repay the Lender in complete and final satisfaction of the DIP Financing Agreement.

B.       Consolidation of the Debtor's Subsidiaries Cash

13.     Prior to and following the commencement of this Case the Debtor had two subsidiaries – GWR Distributors, LLC and Green Roads Wellness, LLC (together the "Subsidiaries").  These Subsidiaries were not debtors in the Case (or any other chapter 11 case).  However, due to the nature of the Debtor's pre-petition operations, many of the Debtor's bank accounts were held in the name of the Subsidiaries.  *See Debtor's Emergency Motion for Entry of*

4

23761915.v3

*an Order Approving the Continued use of the Debtor's Cash Management System and Granting Related Relief* [Docket No. 14] (the "Cash Management Motion").  These included two accounts at Bank of America ("BOA") that were titled in the names of the Subsidiaries.

14.     Unfortunately, during the pendency of this Case, counsel to BOA informed the Debtor that the State of Illinois Department of Revenue had sent a Notice of Levy asserting that one of the Subsidiaries owed the Illinois Department of Revenue $6,346.66 plus interest and directing BOA to place a hold on the Subsidiaries' accounts.  Accordingly, on July 20, 2023, the Debtor filed a motion seeking authorization to transfer the funds in the Subsidiaries' accounts to the Debtor's accounts and to dissolve the Subsidiaries. [Docket No. 106] (the "Subsidiary Motion").  On August 14, 2023, the Court entered an order granting the Subsidiary Motion.  This significantly streamlines the Debtor's ability distribute all remaining available assets to creditors under a plan of liquidation, and simplifies the Debtor's post-confirmation wind-down process.

C.     Resolution of Tax Issues and Claims

15.     Prior to the Sale, the Debtor business included the sale of products in brick-and-mortar retail locations and online on the Debtor's e-commerce website.  As a result of this business model, the Debtor incurred, in the ordinary course of its business, sales tax liability in numerous states across the country, in additional to other forms of tax.  The Debtor and/or the Subsidiaries also maintained registered sales tax accounts in numerous states in which the Debtor routinely conducted business.  Identifying the amount of tax owed was a significant issue for the Debtor prior to the Petition Date, indeed it was the reason that the Debtor noticed every state's taxing and/or revenue department, and it was an issue that needed solving following the Sale so that the Debtor could understand the priority claims against it.  The deadline for governmental units to file proofs of claim in this Case was September 5, 2023.

23761915.v3

16. Following this deadline, the Debtor has been in contact and gone through audit procedures with various state taxing authorities that have filed claims against it, as part of a concerted effort to address the potential tax liability of the estate and narrow open issues without intervention from the Court. As a result of the Debtor's efforts negotiating with taxing authorities, the Debtor has successfully lowered the potential tax liability of the estate from more than $256,000.00 to approximately $18,000.00. For example, the Indiana Department of Revenue initially filed a claim against the Debtor in the amount of $ 146,271.63, and later amended that amount upward to $205,444.50. Claims No. 3-1, 3-2. After contacting the Indiana Department of Revenue and providing additional information, the Indiana Department of Revenue further amended its claim down to just $211.88 on April 22, 2024. Claim No. 3-3. Other taxing authorities have withdrawn claims against the Debtor. *See* Docket Nos. 183 and 184. The Debtor has also been successful in convincing other state taxing authorities not to file proofs of claim, including because such claims are no longer timely and would require the Debtor or successor in interest to prepare objections. Resolution of these tax issues will accrue to the benefit of other creditors of the Debtor upon distribution of Sale Proceeds under a plan of liquidation.

17. The Debtor's post-Sale work has also involved reviewing states in which the Debtor regularly conducted business and maintained registered sales tax accounts. The Debtor has identified upwards of twenty different states in which the Debor maintained tax accounts, and has engaged in a process to review outstanding amounts, transfer accounts over to the Purchaser where necessary, and orderly close accounts to ensure that no additional liability accrues. To date, the Debtor has closed sales tax accounts with 19 states, and is in the process of closing accounts with several other states.

18. The Debtor has also engaged the services of Soneet R. Kapila, CPA, CFF, CIRA,

6

CFE and the accounting firm of KapilaMukamal, Certified Public Accountants (collectively "KM") to serve as financial advisor for the Debtor and assist the Debtor in the preparation of tax returns on behalf of the Debtor's chapter 11 estate.  Given the tax issues that have arisen since the close of the Sale, the Debtor believes that utilizing the services of well-respected and qualified professionals such as KM to prepare estate tax returns will help to ensure that any remaining tax issues are addresses efficiently and effectively, and will prevent disputes with taxing authorities that may further delay the confirmation of a plan in this Case.

19.     Throughout the Case the Debtor has investigated paths to monetize Employee Retention Tax Credits ("ERC Credits") that the Debtor earned prepetition.  ERC Credits are refundable tax credits that were created as part of the 2020 Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") for the benefit of companies that were impacted by the COVID-19 Pandemic.  The Debtor earned ERC Credits prior to the Petition Date, and believes that these ERC Credits could be a meaningful source of value for the benefit of unsecured creditors.  The Debtor's efforts have included negotiations with SNDL for a sale of the ERC Credits, as part of resolution of claims that the Debtor may have against SNDL.  However, these negotiations have stalled out and the Debtor is continuing to investigate how to liquidate the ERC Credits for the benefit of the estate, including on a post-confirmation basis.

20.     Lastly, the Debtor has collected certain accounts receivables and is in the process of the 2022/2023 401k audit in order to file the 5500s to formally end the plan.

D.      Proposal of a Chapter 11 Plan of Liquidation

21.     On April 23, 2024, the Debtor filed its *Disclosure Statement for the Chapter 11 Plan of Liquidation Proposed by Green Roads, Inc.* [Docket No. 189] (the "Disclosure Statement") and its *Chapter 11 Plan of Liquidation Proposed by Green Roads, Inc.* [Docket No. 188] (the

23761915.v3

"Plan"). Pursuant to the Plan, the Debtor seeks to liquidate any and all remaining assets and make distributions, including from Sale Proceeds, to creditors. As stated in the Disclosure Statement, the Debtor estimates that it will be able to pay approximately 23.1% of claims held by holders of unsecured claims on a pro rata basis.

22.    The Debtor initially planned to file the Disclosure Statement and Plan and seek confirmation of its Plan before the end of 2023, and to that end prepared drafts of each document in the fall of 2023. The Debtor circulated a draft of the Plan to various parties in interest, including SNDL, in November of 2023. Further, the Debtor shared a draft of the Plan with the U.S. Trustee in November of 2023 and invited the U.S. Trustee's comment and feedback on the draft Plan.

23.    A central component of the initial draft of the Plan that the Debtor hoped to file and confirm was the contribution of additional funds from SNDL (the "SNDL Contribution"), which ensured that the Debtor could satisfy all priority tax claims asserted against it and preserved Sale Proceeds to be distributed for the benefit of general unsecured creditors. In exchange for the SNDL Contribution, the Debtor would agree to release SNDL from any causes of action that the Debtor may have against it, and would sell the ERC Tax Credits to SNDL and permit the SNDL to pursue the ERC Tax Credits for its own benefit. However, as described above, these negotiations were not fruitful and the Debtor was unable to propose a plan that included the SNDL Contribution as a key feature. Nonetheless, the Debtor, as further described above, has been successful in negotiation with state taxing authorities to reduce the amount of outstanding tax claims against the estate. Accordingly, the Debtor now feels that proposing a plan that pays remaining tax claims from estate assets while maintaining any claims against SNDL and the ERC Credits is a more viable path for confirmation of a plan than it was several months ago.

23761915.v3

**RESPONSE**

24.    The Debtor believes that this Case is now near its culmination and that conversion or dismissal would be a significant hindrance that would delay resolution and harm unsecured creditors.  Creditors should have the opportunity to choose – through solicitation of the Disclosure Statement and Plan – regarding whether the Plan should be confirmed or whether a different disposition is necessary. *See Camden Ordnance Mfg. Co. of Ark., Inc. v. United States Tr. (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 802 (E.D. Pa. 2000) ("[C]reditors are the best judge of their own best interests.")

25.    Accordingly, the Debtor objects to the U.S. Trustee's assertion that this Case should be dismissed on converted based on a "substantial or continuing lost to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" pursuant to section 1112(b)(4)(A) of the Bankruptcy Code, and asks the Court to find the Debtor's progress towards resolution of this Case and confirmation of the Plan constitutes an "excused" failure pursuant to section 1112(b)(4)(F) under the circumstances of this Case.  *In re Creech*, 538 B.R. 245, 252 (Bankr. E.D.N.C. 2015) ("To warrant cause for dismissal or conversion, the non-filing or untimely filing of required reports must be 'unexcused'; therefore, it is within the court's discretion to determine whether the debtor's failure establishes cause.").  Alternatively, the Debtor believes that there is an adequate basis for the Court to determine that there are "unusual circumstances," namely the prospect for distribution of assets to unsecured creditors as proposed under the Plan, that establish that conversion or dismissal are not in the best interest of creditors, and that there is a reasonable likelihood that a plan will be confirmed in a reasonable period of time.  11 U.S.C. § 1112(b)(2).

26.    The Court's statement that the docket in this Case "fails to show any discernable progress toward concluding the case" is understandable, as much of the Debtor's efforts have

9

occurred out-of-court.  However, the post-Sale activities described herein show that the Debtor has made considerable progress in recent months.

27.    The Debtor acknowledges that monthly operating reports have frequently been filed late, and apologizes to the Court for that.  However, the Debtor has now filed all required monthly operating reports, including its March 2024 operating report on a timely basis. What is more, no party has called into question the accuracy of the Debtor's operating reports, which is at least as important as the reports' timeliness.  *See In re Tucker*, 411 B.R. 530, 532 (Bankr. S.D. Ga. 2009) ("Filing a piece of paper is meaningless if the content is inaccurate, misleading, or wrong, thus the content of these documents is always relevant.").  The Debtor believes that now that the operating reports are filed, the Debtor has explained the progress it has made, and creditors have an opportunity to vote on the Plan – that dismissal for cause is not warranted.   The Debtor acknowledges the importance of monthly operating reports and will not be behind again, but it believes that many of the cases cited in the Show Cause Order are distinguishable from this Case because, among other things, relief is not sought by a creditor here and there are no allegations of mismanagement.  *See e.g., In re No Rust Rebar, Inc.*, 641 B.R. 412, 428 (Bankr. S.D. Fla. 2022) (subchapter V case dismissed following motion by creditor for cause including comingling of estate assets, the filing of an unconfirmable plan, deficient schedules, late monthly operating reports, and mismanagement); *In re 210 W. Liberty Holdings, LLC*, 2009 WL 1522047, at *7 (Bankr. N.D. W. Va. 2009) (case dismissed following motion by creditor for cause, including several instances of mismanagement and late monthly operating reports).

28.    The Debtor also objects to and disputes certain factual contentions made by the U.S. Trustee in the UST Motion.  First, the U.S. Trustee asserts that the "Debtor failed to file its monthly operating report for February 2024."  UST Motion, ¶ 5.  However, the Debtor filed its

23761915.v3

February 2024 operating report before the UST Motion was filed, and the Debtor specifically alerted the U.S. Trustee to this fact prior to the UST Motion being filed.[2]

29.     Second, the U.S. Trustee asserts throughout the UST Motion that the Debtor has suffered losses and incurred expenses that it can no longer "afford to pay" and which prevent it from confirming a plan.  UST Motion, ¶¶ 12–13.  However, review of the Debtor's cash position, as reflected in the operating reports, and post-Sale activities described herein reveal that this is not the case.  *See* August 2023 MOR.  In August 2023, the Debtor paid, with Court approval, fees in the amount of $375,000.00 to its investment banker.  *Id.*; *see also* Docket No. 117.  In subsequent months, the Debtor has paid, with Court approval or direction in each instance, the following: (i) the outstanding amounts under DIP Financing Agreement [Docket Nos. 127, 142]; (ii) the claim of an administrative creditor [Docket Nos. 135, 143, 168]; (iii) fees and expenses to bankruptcy counsel [Docket Nos. 166, 170]; and (iv) a retainer to KM [Docket Nos. 162, 175].  All of these costs and expenses would be paid ahead of general unsecured claims in any circumstance, and outside of these payments the cost of administering the Debtor's estate has primarily consisted of payment for services of the Debtor's former-CEO, who is the Debtor's last remaining representative and responsible for winding down the estate.  Indeed, in consideration of the work the Debtor has done to reduce the potential tax liability of the estate, general unsecured creditors are likely to receive a greater recovery under the proposed Plan than they would have received if the Debtor confirmed a Plan several months ago.

30.     Lastly, the U.S. Trustee was aware at the time that it filed the UST Motion that the Debtor was working to finalize a plan of liquidation, as the Debtor had previously shared a draft of the Plan with the U.S. Trustee and sought the U.S. Trustee's comments on the Plan.  Indeed, the

---

[2]     The Debtor also notified the U.S. Trustee that an amendment to its January 2024 operating report was forthcoming.

23761915.v3

Debtor also informed the U.S. Trustee in November 2023 that it was working to finalize the SNDL

Contribution, which was a key part of the plan that the Debtor was at that time seeking to propose.

### CONCLUSION

31.     Based on the foregoing, the Debtor respectfully requests that the Court decline to

dismiss or convert this Case, based on an absence of cause under section 1112(b) of the Bankruptcy

Code, or alternatively because the conversion of dismissal is not in the best interest of creditors

and the estate and because there is a reasonable likelihood that a plan will be confirmed within a

reasonable period of time.

Dated: April 24, 2023                    Respectfully submitted,

*/s/ James R. Irving*
James R. Irving (admitted *pro hac vice*)
DENTONS BINGHAM GREENEBAUM LLP
3500 PNC Tower, 101 S. Fifth Street
Louisville, Kentucky 40202
Telephone:  (502) 587-3606
E-mail:  james.irving@dentons.com

-and-

Jonathan Kaskel (FBN 52718)
DENTONS US LLP
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone:  (305) 537-0009
E-mail:  jonathan.kaskel@dentons.com

-and-

Andrew C. Helman (admitted *pro hac vice*)
DENTONS BINGHAM GREENEBAUM LLP
254 Commercial Street, Suite 245
Merrill's Wharf
Portland, Maine 04101
E-mail:  andrew.helman@dentons.com

*Counsel to Green Roads, Inc.*

23761915.v3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of April, 2024, a copy of the foregoing was sent via this Court's ECF system on all those parties registered to receive said electronic service.

*/s/ James R. Irving*
James R. Irving

*Counsel to Green Roads, Inc.*

23761915.v3